of three cases this morning. I'm going to assume you all are familiar with our lighting system and I'm going to try to enforce it. With that we'll get underway with the first case. So I'll call the case of the United States v. Tamara Andreatta and Stacey Ricks. Counsel. Good morning and may it please the court. Good morning. My name is Erin Pender and I'm assistant federal defender and I'm here on behalf of Ms. Tamara Andreatta. My client was in a sexual relationship with her boss and because of that sexual relation, because of their extramarital affair, she was authorized to use the business cards as she saw fit. This, your honors, was her defense at trial. However, because of the district court's rulings, the jury was never given ample opportunity to consider this defense. And the district court abused discretion in two ways. One, when it prevented a key witness from testifying and two, when it failed to instruct the jury on her sole theory of defense. Together, these errors eroded Ms. Andreatta's Sixth Amendment right to present a complete and meaningful defense. You know, it's, Chris, it's our job to tell you what we think are the weaknesses in your case. I mean, it seems to me that, you know, even if the jury believed her defense that she was in this kind of forced sexual relationship with her boss, she still violated the statute. What is your response to that? No, your honor. She was authorized to use the cards. According to her testimony, she was authorized to use the cards. He called her into his office and said that you keep the cards on you and use the cards however you see fit. So therefore, there was no intent to deceive or attempt to steal any money because she was acting within the authorization that she was given. And for that reason, that's why we believe that the witness should have been testified as well as allowed to testify. And then also, the jury should have been instructed on good faith. Because based off of her testimony, and then that was her theory, that she was authorized and she didn't violate the statute. But it was in fact covered by the just the general intent to defraud charge. I mean, that is to act knowingly on the specific intent to deceive someone. She gets the same benefit from that general charge as she would from a more specific good faith charge, would she not? I don't think so in this case. This court has held several times that I think, although there's holdings that the intent, the knowing, and the willingness would negate the good faith, this court has held several times that you still have to look at the facts of the case and to see whether the effect of giving that instruction or not giving that instruction will impact the defense. And here, not giving that instruction had a serious impact on the One, the way that the judge instructed the jury was that intent to defraud was intent to cheat or to deceive. Here, Ms. Andrietta testified that although she was having this affair and she hid those purchases on the leisure from the credit cards, she was doing that to hide her affair from the rest of the company and the employees, one being Mr. Whitten's wife. So therefore, she did make some intentional acts to cheat or to hide or to deceive, but those acts were done in good faith of the arrangement that she had with her boss. So based off of that testimony, the willingness and knowingly, they don't negate the good faith defense. And so again, when you look at the instructions, how the judge instructed the jury, that's how she defined intent to defraud, intent to deceive or to cheat. So that's a little bit vague. And she didn't admit that she was trying to hide some things. Two, then it says that good faith. It was defined as intent to deceive or to cheat. Those were the two. Yes, that's how she defined it. And then she did say in most cases, financially. She wasn't trying to cheat the company then if the boss knew about it, right? But she was trying to hide. Sorry, Your Honor. Go ahead. Just finish. Okay. I think she was trying to hide her actions. So there was some deception there from the rest of the company. So therefore, when she did do those acts, she did them knowingly, but she did it knowingly in good faith with her arrangement with Mr. Whitten. You know, how is this consistent with the fact that, what, in February of 2008, she borrows $6,000 from Mr. Whitten, right? And she repays it through payroll deductions. But why would she have to borrow $6,000 if she had, according to her theory, unlimited use of credit cards, including cash advances? Isn't that inconsistent with your innocence theory? The loan was a different set of circumstances. When she was called into the financial troubles and then offered her the use of the credit cards. The loan, she may have needed a large sum of cash at one time. But I cannot speculate because those facts didn't come out on the record at times. So I don't know why she would have needed a large sum of cash at one time versus the use of credit cards to maintain her daily living. Well, over the seven years, she took out almost $467,000. That's like $83,000 a year. She could easily have covered $6,000 with the amount she was taking out every year on these credit cards. Yes, and I understand that, Your Honor. But without, that was not given into test, that was not dived into in trial. So I don't want to speculate onto the circumstances of the loan. But I can see that where there'd be circumstances where she may need a large sum of cash if she's in dire need versus you need a couple hundred dollars to make ends meet day to day. I think they could be two different circumstances and they can live together and still match up with her. Now, a witness, what, Barbara Greiner was a witness? And she said that your client said she had, quote, done a terrible thing by using some credit cards for her personal benefit. Yes, Your Honor. That's not exactly consistent with innocence either, is it? Yeah, I mean, that was Barbara Greiner's personal opinion, but she didn't know, she wasn't privy to their arrangement. Well, she's just saying that your client said she, admitting she had done a terrible thing. I mean, the jury could find, hey, that's evidence of guilt, Your Honor. Oh, I'm sorry, I misunderstood you. I thought you were saying that Barbara Greiner said that. I think sleeping and having an extramarital affair could be a terrible thing. So agreeing to being in this arrangement could be a terrible thing. So not knowing the full context of that conversation, I can't say that, again, that that is, negates her defense and her testimony at trial. Thank you. You've saved some time for rebuttal, so we'll hear from you again. May it please the Court. My name is Kermit Dura. I'm an attorney from Albany, Georgia. I was appointed to represent Mr. Ricks, and I also represented Mr. Ricks at trial. If I could begin, even though I don't represent Ms. Andreotti, I would like to say, Judge Gilman, answering those questions, there's no question in the record, the loan from Mr. Whitten to Ms. Andreotti occurred before the sexual relationship started. And then her testimony at trial, and like I say, I don't represent Ms. Andreotti, but I want to clear this up, was that she admitted to Ms. Greiner, I used the money. She also admitted to a police detective that she had made purchases with company credit cards. But her testimony was that she thought until the case was, she was brought into court on the federal charges, that Mr. Whitten was going to want to take care of First, we challenged the conviction on count one, which is conspiracy, because we contend there was no evidence to establish a meeting of the minds. What Judge Abrams found in denying our motion for a directed verdict, and also in a JNOV, was that Mr. Ricks, who was in a long-term relationship with Ms. Andreotti, he also worked at Industrial, he received substantial benefit from her authorized use of these credit cards. Now, the fact is, the testimony, not just from Ms. Andreotti, who took the stand and completely exonerated my client, was that Mr. Ricks had no checking account. He didn't handle the finances. Every week, and this is what testimony, he would take his check on Thursday or Friday to Ms. Andreotti, and she handled all the finances. One thing that is extremely important, our second argument, which I would like to focus on here, is that during Mr. Whitten's testimony, it was kind of an odd exchange between he and the United States Attorney. What did Mr. Ricks tell you? And this is what's important. The unauthorized to work at Industrial Management until November of 2013. On that day, Mr. Whitten brought him in, and his testimony at trial was that Stacey admitted he knew Tammy had used these cards. The Assistant United States Attorney started bearing down on him. Well, tell us exactly what Mr. Ricks said. Mr. Whitten finally said, he told me that he knew that Tammy was making these charges on his credit card. That is the only direct evidence linking Stacey Ricks to the unauthorized use of these credit cards. Why is that important? Because on cross-examination, I confronted Mr. Whitten with a transcript from the unemployment hearing when Stacey Ricks was trying to get unemployment benefits. Mr. Whitten testified under oath on that day. The hearing officer said, what explanation did Mr. Ricks give you? Mr. Whitten, only a few months after he fired Stacey Ricks in November 2013, said he didn't say anything. He just turned and Mr. Whitten, do you remember the day that you terminated Stacey Ricks, you went in and you told the office manager, Elzora Dean, what do you think about Stacey? I don't know whether he did it or not, but he's living with her. I can't have him here. The same day that according to his trial testimony, Mr. Ricks admitted that he knew Ms. Andreetti had been using these credit cards. Judge, I asked Mr. Whitten, did you make this statement to Ms. Dean? Mr. Whitten says, I don't recall making that statement. In my case in chief, I say I don't recall. Is that when he said, it sounds like something I could have said? Is that the remark you're talking about? No, he says, I don't remember making that statement, Judge Carnes. That's what is important. And what happened here was the United States attorney objected and said, this isn't a prior inconsistent statement. Ms. Dean can't testify because he said he doesn't remember making the statement. And in my next two minutes, I'd just like to address the authority on that and to establish that the failure to admit, the failure to recall making a statement does not bring it outside of the rule allowing prior inconsistent statements. Thank you. Thank you. Good morning. Good morning. May it please the Court, Michelle Schieber for the United States. Judge Gilman, I would like to respond to a comment you made about the loans. I know I didn't do a good job of bringing it out in the brief, but there was more than one loan. There was the first loan that, according to Ms. Andrade, triggered Mr. Whitten's propositions. But there was also a later loan. There were a couple of later loans. And there was also, and this is important, the point at which Stacey Ricks used his credit card to purchase personal supplies and then paid that money back. And that was all in that period between 2006 and 2008. And that evidence really showed their financial need. And after that, I mean, it's like 2008, after those loans, after he demonstrates that he understands that he can't use these credit cards for his personal use, that all of a sudden this incredible change in their financial situation comes about. And these incredible dollar figures start coming up in terms of the cash. It's $3,000 in cash, you know, that suddenly shows up. And these, you know, all of these lavish trips that just four years, you know, less than four years ago they were taking out these loans, I think is very important. And I think it demonstrated to the jury that Mr. Ricks, in spite of Andrade's attempts to exonerate him, clearly knew that something was going on and chose to ignore it or chose to not step up. And his knowledge is really important, too, because his willingness, I should say, to ignore it is instrumental in why the jury was willing to convict him. And he had this knowledge of all this money. Well, beyond just knowledge, you can be married to a thief and that doesn't mean you get convicted for being a thief. But I thought the way the indictment was structured was that these payments were made for his benefit, car insurance for his car, car payments on his car, that joint phone bills and utility bills and did not your evidence establish in one instance he actually swiped a card for his wheels and tires. So your case is more than just he knew his wife was a thief. Yes. And to add to that, which goes to Mr. Durow's statement that the only evidence that he knew about this was the statement that Mr. Whitten made when he confronted him, I think that one time when he swiped that card demonstrated, and here he is making these purchases for that money. He never paid that money back. So he knew. It was more than just what you just said. So his knowledge was established by the evidence. The jury got it right. And the jury had the opportunity to see Ms. Andreata and to see and decide whether she was credible. And it's clear that the jury did not believe Ms. Andreata's testimony, neither about what Mr. Whitten told her nor about what she claimed were Mr. Ricks's lack of knowledge. And the district court got it right when it declined to overturn the jury's verdict. And we respectfully would request that the court do the same. Do you have a question? Just a question. You know, why did the government object to the good faith instruction? Wouldn't it have been better if the instruction had been given? Yes, I do. I do agree that it would have. You know, I think that when you read the part of the transcript where that takes place, he says, well, it's just it's a he said, she said thing. And so he just saw it as more or less a credibility determination. He, you're talking about. I'm sorry, the prosecutor who tried the case, you know, when he was asked about whether or not the good faith, his position on the good faith charge said, you know, this is just a he said, said, she said kind of thing. It's not really, he didn't see her claim as evidence of good faith. It was just sort of, you know, in his mind, her concoction. You're saying it would have been better because you wouldn't have to deal with this issue. Are you saying, are you conceding then that we should reverse on that ground? What are you saying? Exactly what the court said earlier, which is that the judge's charge on willfulness and knowingness was sufficient and that there's a lot of solid case law in the circuit, as you recognize, that holds that as long as the charge covers the points that would have been brought out by the good faith defense, that that's sufficient. And we believe that it was sufficient. Any more questions from the court? Thank you. Thank you for your time. As far as with the good faith instruction, I want to be clear that it's not a credibility issue. That's for the jury to decide. It's whether there was sufficient, there was a foundation at trial for the instruction to be given.  And although there is some case law in that whether willingness and knowingly negates the good faith instruction, all the case law in the recentest 2011 when this court decided United States v. Hill, you still, it doesn't, that's not a per se rule. And this court has been very clear on that. And that you have to look at the facts of the case and to determine whether they negated itself. And so when I, again, you look at the facts of the case, the instructions and the way the court defined the intent of the fraud, the jury needed to know that good faith is a complete defense to intent of the fraud. But as opposing counsel just said, and I didn't mention this extra instruction when I asked you my question before, but willfully is pretty strong. Willfully means that the act was committed voluntarily and purposely with the intent to do something that the law forbids. That is with a bad purpose to disobey or disregard the law. That kind of encompasses good faith, does it not? I don't think so when you look at the facts of this case. And that was for the jury to decide if they believe that what Andrea testified to, that she had this arrangement, that she was, all her actions were done in good faith of the arrangement, the jury should have been able to give that instruction and consider that evidence along with that instruction. But if you don't get that instruction, then the jury never had a way to acquit my client. So it's not just a credibility issue here. That's for the jury to decide. So if the assistant U.S. attorney, when he's trying and saying that he said she said situation, then the jury should have been given the instructions on her side of the story and his side of the story, but they weren't. Were you trial counsel? No, I was not. Did trial counsel, I would assume, argue this very language and said my client, Ms. Andreata, did not, if you believe her testimony, did not do anything purposely to disobey the law? I'm sure, I would suspect he made that argument, did he not? He did. But as we all know, jury deliberations are long, they're intense, but they take back that charge. And that charge is what they can read over and over again as they go through the deliberations. And so, although closing arguments can be strong and impassionate, they don't go back to the jury room. The instructions do. And with that, Your Honor, I respectfully request that you reverse Ms. Andreata's convictions and remand it back to the district court. Thank you. Judge Carnes, if I might, I just want to point out that there was no direct evidence that Mr. Ricks actually swiped that card at Goodyear. The manager of Goodyear said he didn't recall the specific transaction. There were some differences between them. I mean, it was a credit card, a company credit card in his name. So he didn't do it, she did it, and he gave his wife the credit card. And I also thought the handwriting matched his handwriting, is that what you're saying? Well, there were some differences in the handwriting, Judge Carnes, but the fact is that credit card was locked, the testimony. He didn't have access to the credit card. The other evidence was that when these parties separated in the fall of 2012, he borrowed $5,000 from his mother to open up an account. He didn't get a cash withdrawal the whole time they were separated. He started making payments on his vehicle that she'd been making on company credit cards. There's clear that Mr. Ricks didn't know about it. But back to the testimony of Elzora Dean, I want to cite the Court's attention to the United States v. Sisto. It's a case 534, Fed Second, 616. It was decided right before the Federal Rules of Evidence came into play. There was a gentleman who had accompanied the defendant to Columbia, and he testified that we just went down there to buy some leather goods, and we were going to start a store when we got back. Unbeknownst to this gentleman, Mr. Shanty, he, a few months later, had met with the DEA agent acting undercover, and had told him all the specifics about it. When he was asked by the United States Attorney, do you recall making this statement? He said, no, no, no. And, of course, then the Fifth Circuit held that clearly this evidence was proper. Citing McCormick, prior statement, prior statements may have been oral and unsworn, and the making of the previous statements may be drawn out in cross-examination of the witness himself, or if on cross-examination, the witness has denied making the statement, and I underline this, or has failed to remember it, the making of the statement proved by another witness. It was reversible error to prevent Ms. Dean from testifying. There's no question. We've cited the Ballou case. It's consistent with the law in this circuit. It's consistent with the fundamental rules of evidence. Thank you. Thank you. We appreciate the presentation. You all travel safely home.